NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5748-12T4
                     A-5749-12T4

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

TIMOTHY ADKINS,

     Defendant-Respondent.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TIMOTHY ADKINS,

     Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **December 20, 2013**
>
> **APPELLATE DIVISION**

Argued November 13, 2013 — Decided December 20, 2013

Before Judges Reisner, Alvarez and Ostrer.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 11-08-0734.

Ronald Susswein, Assistant Attorney General, and Jenny M. Hsu, Deputy Attorney General, argued the cause for appellant (A-5748-12)/respondent (A-5749-12) (John J. Hoffman, Acting Attorney General, attorney; Mr. Susswein and Ms. Hsu, of counsel and on the brief).

Richard F. Klineburger, III, argued the cause for respondent (A-5748-12)/appellant (A-5749-12) (Klineburger and Nussey, attorneys; Mr. Klineburger, on the brief).

The opinion of the court was delivered by

REISNER, P.J.A.D.

By leave granted, the State appeals from paragraph one of a June 7, 2013 order, suppressing the results of a warrantless blood test, and defendant appeals from paragraph two of the same order, denying his speedy trial motion. Because we conclude that application of the exclusionary rule is not required in the unusual circumstances of this case, we reverse on the State's appeal. We affirm on defendant's appeal.[1]

I

The suppression issue is novel and arises from the following scenario. On December 16, 2010, defendant was involved in a one-car accident in which his vehicle struck a utility pole and his two passengers were injured. After defendant failed the roadside sobriety tests, the West Deptford police arrested him at about 2:30 a.m., on suspicion of driving while intoxicated (DWI). They transported defendant to police

---

[1] These back-to-back appeals have been consolidated for purposes of this opinion.

headquarters, where they read him his <u>Miranda</u>[2] rights and he invoked his right to counsel. The police later transported defendant to a local hospital. At 4:16 a.m., hospital personnel drew a blood sample at the request of the police.[3] The requesting police officer, defendant, and a hospital nurse each signed a Certificate of Request to Withdraw a Specimen, although defendant signed the form two minutes after the blood was drawn. See <u>N.J.S.A.</u> 2A:62A-11.[4]

---

[2] <u>Miranda v. Arizona</u>, 384 <u>U.S.</u> 436, 86 <u>S. Ct.</u> 1602, 16 <u>L. Ed.</u> 2d 694 (1966).

[3] The record does not indicate the time at which the police took defendant to the hospital. Hence, it is not clear whether an approximately two-hour hiatus, between the time of defendant's arrest and the time the blood was drawn, was attributable to delay in taking him to the hospital or delay experienced at the hospital.

[4] <u>N.J.S.A.</u> 2A:62A-11 is part of a statute that grants civil and criminal immunity to medical personnel who draw blood samples at the request of a law enforcement officer. <u>N.J.S.A.</u> 2A:62A-10(a), -10(b). The statute further provides, in pertinent part: "Any person taking a specimen pursuant to [this statute] shall, upon request, furnish to any law enforcement agency a certificate stating that the specimen was taken pursuant to . . . this act and in a medically acceptable manner." <u>N.J.S.A.</u> 2A:62A-11. After reviewing the certificate in this case, we conclude that it was not intended to establish a suspect's consent to a warrantless search, but rather was intended to satisfy the immunity statute and establish the chain of custody of the blood sample. The State has waived any claim of Fourth-Amendment consent, and for purposes of this opinion it is irrelevant that defendant signed the form after the blood was drawn.

At the time of the accident in 2010, New Jersey law permitted the police to obtain a blood sample without first obtaining a warrant, so long as they had probable cause to believe that the driver was intoxicated.[5]  That principle, derived from Schmerber v. California, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), was based on the presumed exigency created by the dissipation of alcohol levels in the bloodstream, and was clearly stated in opinions of our Supreme Court.  For example, in State v. Dyal, 97 N.J. 229 (1984), the Court observed:  "A drunken driver arrested by police with probable cause to believe he is intoxicated has no federal constitutional right to prevent the involuntary taking of a blood sample.  Of course, the sample should be taken in a medically acceptable manner at a hospital or other suitable health care facility."  Id. at 238 (citing Schmerber, supra, 384 U.S. at 771-72, 86 S. Ct. at 1836, 16 L. Ed. 2d at 920).  The issue in Dyal was whether the police could obtain the results of hospital blood tests drawn for purposes of medical treatment; however, part of the Court's reasoning was that the police had

---

[5] Before the trial court, as on this appeal, defendant did not contest that the police had probable cause to seek a blood test. Because he was the driver in a one-car accident and failed the roadside sobriety tests, probable cause would appear self-evident.

the right to obtain a blood sample from the driver. Dyal, supra, 97 N.J. at 231, 238-39.

Several subsequent Appellate Division decisions likewise read Schmerber as holding that a warrant was not required. See, e.g., State v. Burns, 159 N.J. Super. 539, 544 (App. Div. 1978) ("[C]onsent is not required to the taking of a blood sample, but the taking of such sample must be done in a medically acceptable manner and environment and without force or violence or the threat of same."); State v. Woomer, 196 N.J. Super. 583, 586 (App. Div. 1984) ("[A] blood sample may be taken involuntarily [from a suspected drunk driver] and no consent is required.").

In State v. Ravotto, 169 N.J. 227, 231-33 (2001), the Court held that the police used excessive force in obtaining a blood sample from a drunk driving suspect who was terrified of needles. However, the Court reaffirmed that the police did not need a warrant to obtain the blood test:

> Our holding is not to be understood as suggesting that the police had to acquire a warrant before obtaining a blood sample from defendant or that they acted in an unreasonable manner in seeking treatment for him at the hospital. Because defendant's car was found overturned and his behavior demonstrated obvious signs of intoxication, probable cause existed for the police to seek evidence of defendant's blood alcohol content level. Moreover, consistent with Schmerber and our analogous case law, the dissipating nature of the alcohol content in defendant's blood presented an exigency that

required prompt action by the police. Under those conditions, a warrantless search was justified.

[_Id._ at 250 (citation omitted).]

These rulings were also reflected in Guidelines issued by the Attorney General to county and municipal prosecutors.[6] In pertinent part, the Guidelines advised that "[a] defendant has no right to refuse to allow blood to be drawn as long as the police or law enforcement officer has probable cause to believe that the blood sample will contain evidence of alcohol and/or drugs." _Attorney General Guideline[s]: Prosecution of DWI & Refusal Violations_, at 9 (Jan. 24, 2005); _N.J.S.A._ 39:4-50.2a (requiring the Attorney General to promulgate guidelines).[7] Consequently, when the police obtained the warrantless blood sample from Adkins, they acted pursuant to well-established legal precedent in this State.

---

[6] In this context, we recall our Court's recent admonition in _State v. Dabas_, 215 _N.J._ 114, 136 (2013), that "the prosecutor's office is not at liberty to disregard a pronouncement of this Court, even if that pronouncement is properly characterized as dictum." Likewise, "[a]ppellate and trial courts consider themselves bound by this Court's pronouncements, whether classified as dicta or not." _Id._ at 136-37.

[7] In citing the Guidelines, we do not suggest that the Attorney General can influence our jurisprudence on the exclusionary rule by promulgating guidelines and then asserting that the police reasonably relied on them. We cite the Guidelines only because they rely on clear Supreme Court precedent.

However, years later, the United States Supreme Court clarified Schmerber -- and dramatically changed the legal landscape in New Jersey and many other states -- by holding that there was no per se rule of exigency in drunk driving cases, and that the need to obtain a search warrant before taking a blood sample was to be determined on a case by case basis. Missouri v. McNeely, ___ U.S. ___, ___, 133 S. Ct. 1552, 1563, 185 L. Ed. 2d 696, 709 (2013); see id. at ___ n.2, 133 S. Ct. at 1558 n.2, 185 L. Ed. 2d at 704 n.2. Further, under well-settled federal precedent, the Supreme Court's construction of the Fourth Amendment must be given pipeline retroactivity. Griffith v. Kentucky, 479 U.S. 314, 328, 107 S. Ct. 708, 716, 93 L. Ed. 2d 649, 661 (1987) ("We therefore hold that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past.").

However, when applied in the federal courts, McNeely would not result in suppression of the blood evidence obtained here, because the United States Supreme Court will not apply the exclusionary rule as a remedy where the police conducted a search in good faith reliance on binding legal precedent in the jurisdiction where the search occurred. See Davis v. United

States, ___ U.S. ___, ___, 131 S. Ct. 2419, 2434, 180 L. Ed. 2d 285, 302 (2011).[8]

In Davis, the Court clarified that the retroactivity rule announced in Griffith did not necessarily require application of the exclusionary rule as a remedy where the Court announced a new search and seizure rule. Davis, supra, ___ U.S. at ___, 131 S. Ct. at 2431, 180 L. Ed. 2d at 298-99. "[T]he retroactive application of a new rule of substantive Fourth Amendment law raises the question whether a suppression remedy applies; it does not answer that question." Id. at ___, 131 S. Ct. at 2431, 180 L. Ed. 2d at 298.

Davis addressed searches conducted prior to Arizona v. Gant, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009), a case holding that police could not automatically search the passenger compartment of a vehicle whenever an occupant was arrested. Davis, supra, ___ U.S. at ___, 131 S. Ct. at 2424-25, 180 L. Ed. 2d at 291-92. Recognizing that its prior holding in New York v. Belton, 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d

---

[8] In McNeely, the Supreme Court of Missouri had upheld the suppression of the blood evidence, but the suppression remedy was not addressed in the United States Supreme Court's opinion. See McNeely, supra, ___ U.S. at ___, 133 S. Ct. at 1557, 185 L. Ed. 2d at 703. Further, the Missouri Supreme Court had never construed Schmerber as allowing warrantless blood tests without a case by case showing of exigent circumstances. State v. McNeely, 358 S.W.3d 65, 72-74 (Mo. 2012). Therefore, Davis would not apply to the McNeely search.

768 (1981), had been widely understood as permitting such searches, the Court concluded that the exclusionary rule was not an appropriate remedy for pre-Gant searches. Davis, supra, ___ U.S. at ___, 131 S. Ct. at 2428-29, 180 L. Ed. 2d at 295-97. The Court reasoned that, where the police acted in reliance on established legal precedent, suppressing evidence would not serve the purpose of the exclusionary rule to deter lawless police conduct:

> The question in this case is whether to apply the exclusionary rule when the police conduct a search in objectively reasonable reliance on binding judicial precedent. . . . The search incident to Davis's arrest in this case followed the Eleventh Circuit's [United States v.] Gonzalez[, 71 F.3d 819 (11th Cir. 1996),] precedent to the letter. Although the search turned out to be unconstitutional under Gant, all agree that the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way.
>
> Under our exclusionary-rule precedents, this acknowledged absence of police culpability dooms Davis's claim. Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield "meaningfu[l]" deterrence, and culpable enough to be "worth the price paid by the justice system." The conduct of the officers here was neither of these things. The officers who conducted the search did not violate Davis's Fourth Amendment rights deliberately, recklessly, or with gross negligence. Nor does this case involve any "recurring or systemic negligence" on the part of law enforcement. The police acted in strict compliance with binding precedent,

and their behavior was not wrongful. Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case.

. . . .

About all that exclusion would deter in this case is conscientious police work. Responsible law-enforcement officers will take care to learn "what is required of them" under Fourth Amendment precedent and will conform their conduct to these rules. But by the same token, when binding appellate precedent specifically <u>authorizes</u> a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities. An officer who conducts a search in reliance on binding appellate precedent does no more than "'ac[t] as a reasonable officer would and should act'" under the circumstances. The deterrent effect of exclusion in such a case can only be to discourage the officer from "'do[ing] his duty.'"

That is not the kind of deterrence the exclusionary rule seeks to foster. . . . Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.

[<u>Ibid.</u> (citations omitted).]

In New Jersey, new State constitutional search and seizure rules ordinarily are applied prospectively. "In cases where the new rule is an exclusionary rule, meant solely to deter illegal police conduct, the new rule is virtually never given retroactive effect. The reason is that the deterrent purposes of such a rule would not be advanced by applying it to past

10

misconduct." State v. Burstein, 85 N.J. 394, 406 (1981); see also State v. Earls, 214 N.J. 564, 590 (2013); State v. Purnell, 161 N.J. 44, 54 (1999); State v. Knight, 145 N.J. 233, 251 (1996); State v. Young, 87 N.J. 132, 140-41 (1981); State v. McCann, 391 N.J. Super. 542, 555 (App. Div. 2007); State v. Skidmore, 253 N.J. Super. 227, 236 (App. Div. 1992). Had McNeely been decided by the New Jersey Supreme Court in construing our State Constitution, it would not have been applied retroactively -- thus reaching the same result as in the federal system but by a different route.

The Court's recent decision in State v. Earls does not compel a different result here. In Earls, the Court gave the defendant the benefit of its ruling that, under the New Jersey Constitution, "police must obtain a warrant based on a showing of probable cause, or qualify for an exception to the warrant requirement, to obtain tracking information through the use of a cell phone." Earls, supra, 214 N.J. at 588. The Court recognized that the holding was novel and law enforcement officers could not have anticipated it. Id. at 589. The Court also acknowledged that "deterrence is rarely a basis to apply a new rule retroactively," id. at 590 (citing Knight, supra), and that retroactive application would substantially disrupt the administration of justice. Id. at 591. In that context, the

Court applied the rule "to defendant Earls and future cases only."[9] Ibid.; see also State v. Henderson, 208 N.J. 208, 302 (2011). Unlike Earls, in this case defendant's appeal did not result in a new interpretation of our State Constitution, which might justify giving him the benefit of the new rule; rather, he simply invoked newly-decided federal case law which, in the federal court system, would not benefit him.[10]

In our view, the real issue here is whether, given the federal retroactivity requirement, we should, as the State argues, apply an approach analogous to that set forth in Davis,

---

[9] The Court also held that the warrant requirement would take effect thirty days after its decision to give the Attorney General time to issue guidance to state and local law enforcement. Ibid.

[10] Defendant's reliance on State v. Wessells, 209 N.J. 395 (2012), is not persuasive. Wessells was not a Fourth Amendment search-and—seizure case and, not surprisingly, the opinion does not mention Davis. In Wessells, our Court applied a new Fifth Amendment ruling of the United States Supreme Court and determined, using "the ordinary federal retroactivity analysis," id. at 413, that the defendant was entitled to the benefit of the federal ruling because he had not yet been tried. Under federal Fifth Amendment principles, "the coercive taint of the initial interrogation had not dissipated" when defendant made his later incriminating statements to the police, and, therefore, those statements were deemed "not voluntary." Ibid. No such considerations apply to the blood evidence here, which cannot be regarded as tainted or unreliable by virtue of the warrantless manner in which the police obtained it. See Sanchez-Llamas v. Oregon, 548 U.S. 331, 349, 126 S. Ct. 2669, 2681, 165 L. Ed. 2d 557, 578 (2006) (noting that coerced confessions "tend to be unreliable").

or whether, as defendant argues, the result here is dictated by State v. Novembrino, 105 N.J. 95, 157-59 (1987), which rejected a "good faith" exception to the application of the exclusionary rule.

In Novembrino, our Court, in construing the State Constitution, declined to follow the rule announced in United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). Leon held that the exclusionary rule would not apply where the police acted in objectively reasonable reliance on a facially valid search warrant, which was issued by a judge but was "ultimately found to be unsupported by probable cause." Id. at 900, 922, 104 S. Ct. at 3409, 3420, 82 L. Ed. 2d at 684, 698.[11] In adopting what it characterized as a "good-faith exception for searches conducted pursuant to warrants," the Leon Court reasoned that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." Id. at 924, 922, 104 S. Ct. at 3420-21, 82 L. Ed. at 698-99.

---

[11] In Leon, the Court of Appeals held that the warrant was invalid because it was based on stale information from an informant, and did not sufficiently establish the informant's credibility. Id. at 904-05, 104 S. Ct. at 3411, 80 L. Ed. 2d at 686-87. The Supreme Court assumed, without deciding, that the warrant was invalid for lack of probable cause. Ibid.

In declining to adopt the good faith rule, under the auspices of the New Jersey Constitution,[12] our Court characterized <u>Leon</u> as solely concerned with deterring unlawful police conduct:

> The major premise of the Court's holding in <u>Leon</u> is that the exclusionary rule is not required by the fourth amendment but rather operates as "'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the person aggrieved.'" The opinion observes that in view of the rule's function as a deterrent of police misconduct, its application in particular cases "must be resolved by weighing the costs and benefits of preventing the use in the prosecution's case-in-chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective."
>
> The majority, after citing examples of the Court's prior application of the cost-benefit analysis to the exclusionary rule, concluded that there is little likelihood that the exclusion of evidence obtained pursuant to a subsequently invalidated search warrant will have a deterrent effect on law-enforcement officers.
>
> [<u>Novembrino</u>, <u>supra</u>, 105 <u>N.J.</u> at 140-41 (citations omitted).]

Our Court disagreed with <u>Leon</u>, emphasizing the critical constitutional significance of the probable cause standard. <u>Id.</u>

---

[12] <u>N.J. Const.</u>, art. I, ¶ 7.

at 107-08. Indeed, much of the opinion is devoted to a discussion of the probable cause standard and its central importance to the warrant requirement. Id. at 105-22. The Court also observed that the defects in the Novembrino warrant probably resulted from the hurried actions of an inexperienced police officer. Id. at 129. The Court concluded that suppressing evidence seized pursuant to invalid warrants would safeguard the integrity of the process by which warrants are sought and issued. "Our view that the good-faith exception will ultimately reduce respect for and compliance with the probable-cause standard that we have steadfastly enforced persuades us that there is a strong state interest that would be disserved by adopting the Leon rule." Id. at 154.

Our Court also took a broader view of the purpose of the exclusionary rule:

> Our concern . . . is with the Constitution and with the basic and fundamental guarantees that that document was intended to afford to all our citizens, particularly in times of public ferment. In our view, the citizen's right to be free from unreasonable searches and seizures conducted without probable cause is just such a fundamental principle, to be preserved and protected with vigilance. In our tripartite system of separate governmental powers, the primary responsibility for its preservation is that of the judiciary.
>
> The exclusionary rule, by virtue of its consistent application over the past twenty-

five years, has become an integral element of our state-constitutional guarantee that search warrants will not issue without probable cause. Its function is not merely to deter police misconduct. The rule also serves as the indispensable mechanism for vindicating the constitutional right to be free from unreasonable searches. Because we believe that the good-faith exception to the exclusionary rule adopted in Leon would tend to undermine the constitutionally-guaranteed standard of probable cause, and in the process disrupt the highly effective procedures employed by our criminal justice system to accommodate that constitutional guarantee without impairing law enforcement, we decline to recognize a good-faith exception to the exclusionary rule.

[Id. at 156-58 (footnote omitted).]

As an intermediate appellate court we are, of course, bound by Novembrino. However, we do not believe that Novembrino applies to the very different circumstances of this case, which has nothing to do with invalid warrants or unlawful police activity. In reaching that conclusion, we note that in very limited circumstances, the Court has signaled that application of the exclusionary rule may not always be appropriate where applying the rule would not serve its well-understood purposes.

In State v. Harris, 211 N.J. 566 (2012), the Court declined to order the suppression of an illegal handgun seized during a search authorized by a warrant properly issued pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35. Unlike a warrant issued for a criminal investigation, a domestic

violence warrant need not be issued on probable cause. However, the Court reasoned that the gun was discovered and seized during a "special needs search," conducted to protect a victim of domestic violence and not for the purpose of uncovering evidence of crime. Id. at 584. Ordinarily, the fruits of such a search may be admissible in a subsequent criminal prosecution, so long as the search was conducted pursuant to a valid domestic violence warrant and was not a mere pretext to uncover criminal evidence. Id. at 585-86 (citing State v. Dispoto, 189 N.J. 108, 123 (2007)).

In declining to apply the exclusionary rule, however, the Court further stated:

> It is also appropriate to consider the purpose that undergirds the exclusionary rule. Almost inevitably, whether as the result of mistake, inadvertence, ignorance, or overzealousness, police can come into possession of evidence bearing on criminal activity without having complied perfectly with the constitutional requirement of probable cause. In response to this reality, courts have crafted the exclusionary rule, under which evidence seized illegally is suppressed. United States v. Calandra, 414 U.S. 338, 347-48, 94 S. Ct. 613, 619-20, 38 L. Ed. 2d 561, 571 (1974); Handy, supra, 206 N.J. at 45-46. The purpose of the rule is two-fold: 1) to assure that the law does not provide an incentive for police misconduct and 2) to protect judicial integrity. Mapp v. Ohio, 367 U.S. 643, 655-59, 81 S. Ct. 1684, 1692-94, 6 L. Ed. 2d 1081, 1090-92 (1961); Elkins v. United States, 364 U.S. 206, 216-17, 80

17

> S. Ct. 1437, 1444, 4 L. Ed. 2d 1669, 1677 (1960). <u>Here, there was no misconduct of any sort, no mistake in executing the warrant, and no disregard of its requirements. Consequently, to apply the exclusionary rule in this context would not further any of its purposes.</u> We reach this conclusion in this limited, particular context, and we should not be understood at this juncture as retreating from our earlier rejection of the good faith exception. State v. Novembrino, 105 N.J. 95, 157-58 (1987).
>
> [Harris, supra, 211 N.J. at 590 (emphasis added) (citing State v. Handy, 206 N.J. 39, 45-46 (2011)).]

The above-quoted language is readily applicable to this case. Like Harris, and unlike Novembrino, here there was no mistake by the police, good faith or otherwise. At the time of the search, their conduct was lawful under well-established case law in this State. See also State v. Domicz, 188 N.J. 285, 295-96 (2006) (declining to characterize a thermal scan as "unlawful conduct" by the police, when at the time of the scan, most courts that had considered the issue had held that a thermal scan was not a "search"). The police were not acting pursuant to an invalidly-issued warrant which they mistakenly thought was valid. Nor was there any unreasonable or improper conduct by another State law enforcement employee involved in the search.

This case is not like State v. Handy, where a police dispatcher negligently and inaccurately informed an officer that

A-5748-12T4

there was an outstanding warrant for the defendant. Handy, supra, 206 N.J. at 41-42. Handy was arrested, and a search incident to the arrest yielded contraband. Id. at 42. The Court distinguished prior federal cases involving "an attenuated clerical error in a database upon which police officials reasonably relied." Id. at 52. Instead, the Court found that the dispatcher was "an active participant" in the chain of events leading to the defendant's arrest. Id. at 47-48. The Court concluded that suppression "would have important deterrent value, would underscore the need for training of officers and dispatchers to focus on detail, and would serve to assure that our own constitutional guarantees are given full effect." Id. at 52. Cf. State v. Pitcher, 379 N.J. Super. 308, 311 (App. Div. 2005) (declining to suppress evidence where the police officer stopped defendant's car based on a computer check of Motor Vehicle records, which inaccurately indicated that the car's owner had a suspended license).

Handy is not on point because, at the time the police obtained the blood sample in this case, they were conducting themselves in a manner sanctioned by decades of precedent from our Supreme Court. No amount of additional police training would have deterred the search in this case, because the police were following the law as it existed at the time. As in Harris,

suppressing the evidence would not serve the purpose of the exclusionary rule to prevent illegal police conduct. Nor would admitting the evidence involve the judiciary in what <u>Handy</u> described as "'the taint of partnership in official lawlessness.'" <u>Handy</u>, <u>supra</u>, 206 <u>N.J.</u> at 45 (citation omitted).

While it could be argued that suppression would, in some abstract sense, vindicate defendant's state and federal constitutional right against illegal searches, it would do so at a cost our Court has not always found justifiable. Retroactivity analysis implicitly recognizes that, where retrospective application of a new rule of law will inflict major disruption on the criminal justice system, some defendants will not get the benefit of the new rule even if it implicates constitutional rights. Thus, in declining to give retroactive application to new search and seizure rulings -- and to various other criminal law rulings, <u>see</u>, <u>e.g.</u>, <u>Henderson</u>, <u>supra</u>, 208 <u>N.J.</u> at 302, -- the Court necessarily deprives some defendants of an avenue to vindicate newly-recognized rights.

In the very narrow circumstances presented here, we conclude that <u>Harris</u> and by analogy, <u>Davis</u>, signal the correct path to our decision. We recognize that there are doctrinal differences between the reasoning in <u>Davis</u> and in <u>Harris</u>. For example, <u>Davis</u> rested in part on the good faith exception

articulated in <u>Leon</u>, which our Court rejected in <u>Novembrino</u>. But at the heart of both opinions is the same core of common sense.

"In this case, the State does not seek to admit the fruits of unlawful police conduct since the police fully complied with the law in effect at the time they acted." <u>Skidmore</u>, <u>supra</u>, 253 <u>N.J. Super.</u> at 237.[13] Consequently, application of the exclusionary rule here would not serve the rule's principal purposes articulated by our Court. It would not deter unlawful police conduct, and it would not meaningfully safeguard the integrity of our judicial process. It is one thing for our courts to eschew involvement in admitting evidence seized unlawfully. It is another thing entirely to exclude evidence seized in conformity with the law as it existed at the time of the seizure. Consequently, we reverse the trial court's order suppressing the blood evidence.

In reaching this conclusion, we emphasize the unusual circumstances of this case, where (a) the United States Supreme Court issued a new search and seizure rule that was more

---

[13] <u>Skidmore</u> involved a retroactivity analysis of <u>State v. Hempele</u>, 120 <u>N.J.</u> 182 (1990), which held that police searches of curbside garbage required a warrant. <u>Skidmore</u> concluded that because <u>Hempele</u> represented a dramatic break with prior law, it would not be applied retroactively. <u>Id.</u> at 238. <u>Skidmore</u>, therefore, did not reach the issue of whether the exclusionary rule would apply if the <u>Hempele</u> ruling were retroactive.

restrictive than existing precedent from our Supreme Court; (b) at the time the search was conducted, it was authorized by settled precedent from our Supreme Court; and (c) had the new rule been issued by our Supreme Court as an interpretation of the New Jersey Constitution, it would not have been applied retroactively.

> **[At the direction of the court pursuant to R. 1:36-2(a), the discussion addressing the defendant's appeal in Part II has been omitted from the published version of the opinion.]**

Affirmed in part, reversed in part, and remanded for trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION