**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3218-15T2

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

MICHAEL CASSELLA,

       Defendant-Appellant.

_____

       Argued September 28, 2017 — Decided October 16, 2017

       Before Judges Simonelli, Haas and Gooden Brown.

       On appeal from Superior Court of New Jersey, Law Division, Morris County, Indictment No. 12-01-0075.

       Donald M. Lomurro argued the cause for appellant (Lomurro, Munson, Comer, Brown & Schottland, LLC, attorneys; Mr. Lomurro, of counsel; Christina Vassiliou Harvey, on the briefs).

       Paula Jordao, Assistant Prosecutor, argued the cause for respondent (Fredric M. Knapp, Morris County Prosecutor, attorney; Ms. Jordao, on the brief).

PER CURIAM

This matter returns to us following remand proceedings ordered by the Supreme Court. State v. Cassella (Casella II), 223 N.J. 161 (2015). Defendant now appeals from the March 17, 2016 Law Division order denying his motion to suppress the test results from a blood draw taken by hospital personnel without his consent or a search warrant after he caused a fatal car accident which resulted in the death of a police officer. We affirm.

## I.

By way of background, a grand jury indicted defendant for first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a), and second-degree vehicular homicide, N.J.S.A. 2C:11-5(a). Defendant was also charged with several traffic offenses, including driving while intoxicated (DWI), N.J.S.A. 39:4-50. After the trial judge denied his motion to suppress the blood test results, defendant pled guilty to first-degree aggravated manslaughter and DWI, and the court sentenced defendant to twenty years in prison, subject to the 85% parole ineligibility provisions of the No Early Release Act, N.J.S.A. 2C:43-7.2, and suspended defendant's driver's license for seven months following his release from prison.

Six weeks after the judge sentenced defendant, the United States Supreme Court issued its decision in Missouri v. McNeely, 569 U.S. 141, 165, 133 S. Ct. 1552, 1568, 185 L. Ed. 2d 696, 715 (2013), which held that "in drunk-driving investigations, the

natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." One week later, defendant filed his notice of appeal, primarily arguing that McNeely should be applied retroactively. Relying upon our decision in State v. Adkins (Adkins I), 433 N.J. Super. 479, 486 (App. Div. 2013), rev'd and remanded, 221 N.J. 300 (2015), we held that McNeely should not be applied retroactively to suppress blood tests taken without a warrant and, therefore, we affirmed defendant's conviction. State v. Cassella (Cassella I), No. A-3908-12 (App. Div. Mar. 11, 2014) (slip op. at 5-6).

Defendant filed a petition for certification. While it was pending, our Supreme Court issued its decision in State v. Adkins (Adkins II), 221 N.J. 300, 317 (2015), which held that McNeely would be given pipeline retroactivity to all blood draws from suspected drunk drivers. Thereafter, the Court granted defendant's petition and summarily remanded the matter to the Law Division "for a new suppression hearing in order that exigency may be assessed on a newly developed and more full record in light of the Court's holding in" Adkins II. Cassella II, supra, 223 N.J. at 161.

II.

In <u>Adkins II</u>, the Court instructed trial judges that on a remand for a new suppression hearing in a pipeline case, the totality of all the circumstances preceding the blood draw must be examined. <u>Supra</u>, 221 <u>N.J.</u> at 317. The Court further held that

> law enforcement should be permitted . . . to present to the court their basis for believing that exigency was present in the facts surrounding the evidence's potential dissipation and police response under the circumstances to the events involved in the arrest. Further, the exigency in these circumstances should be assessed in a manner that permits the court to ascribe substantial weight to the perceived dissipation that an officer reasonably faced. Reasonableness of officers must be assessed in light of the existence of the <u>McNeely</u> opinion. But, in reexamining pipeline cases when police may have believed that they did not have to evaluate whether a warrant could be obtained, based on prior guidance from our Court that did not dwell on such an obligation, we direct reviewing courts to focus on the objective exigency of the circumstances that the officer faced in the situation.
>
> [<u>Ibid.</u>]

Here, the parties stipulated that the testimony of several witnesses at the initial suppression hearing could be considered by the judge on remand, and the State recalled two witnesses to provide additional testimony at the remand hearing. Based upon this testimony, the totality of circumstances surrounding the blood draw was as follows.

At approximately 12:12 a.m. on October 16, 2011, defendant was involved in a motor vehicle accident on Route 80 in Roxbury that caused the death of Officer Joseph Wargo of the Mount Arlington Police Department. Defendant was traveling westbound at a high rate of speed when he lost control of his car, crossed the grass median, and went into the eastbound lanes, where he struck Officer Wargo's patrol car head-on. Defendant's car came to a rest perpendicular to the eastbound center and right lanes, while the officer's car was forced off the road into the woods.

At approximately 12:15 a.m., Troopers Antonio Sousa and Michael Gould separately responded to the scene of the accident. Upon arrival, the troopers saw defendant's heavily-damaged car and noticed debris all over the highway. At this time, the troopers were unaware that Officer Wargo's car was off the road in the woods.

Defendant was still behind the wheel of his car and did not appear to be seriously injured. Troopers Sousa and Gould testified that when they asked defendant if he was hurt, defendant's responses were slow and his speech was slurred. Trooper Gould also noticed that defendant's "pupils were very constricted" and he was nodding "in and out[.]"

By this time, the troopers saw several civilian witnesses walking on the shoulder of Route 80 near the accident scene.

Suddenly, a woman screamed that there was another car that was on fire in the woods. Trooper Sousa ran to investigate, while Trooper Gould remained with defendant. Trooper Sousa found Officer Wargo trapped inside his patrol car due to extensive front-end damage. Officer Wargo would later die as the result of the serious injuries he sustained. Several other New Jersey State Troopers, along with a number of firefighters and emergency medical technician (EMT) personnel, soon responded to the scene to assist in the efforts to extricate Officer Wargo from his vehicle and secure the accident scene.

While these efforts continued, Trooper Gould placed defendant in the backseat of a patrol car for safety purposes, and did not handcuff him. At approximately 12:27 a.m., Trooper Gould noticed that his mobile video recorder (MVR) was not on and he manually activated it. Trooper Gould then questioned defendant about the accident and asked if he had been drinking or using drugs, which defendant denied. Trooper Gould testified that defendant appeared disoriented. Based on these observations, and the fact that he did not detect an odor of alcohol, Trooper Gould believed defendant had been using some kind of narcotic.

Trooper Gould wanted to perform field sobriety tests, but the accident scene had still not been secured. By this time, a number of municipal police officers from Mount Arlington had arrived to

assist with diverting and controlling the traffic that was already backing up on Route 80.

Trooper Gould was in contact with his two supervisors back at the barracks. Trooper Gould testified that at that time, a trooper was not required to obtain consent or a search warrant before taking a suspect to a hospital for a blood draw and neither supervisor directed him to do so.

On cross-examination, defense counsel asked Trooper Gould and Trooper Patrick Freeland to address a document entitled "Obtaining Blood for [DWI] Prosecution" that the defense had found on the State Police website. In pertinent part, this document stated:

> Officers should use tact and diplomacy when requesting the assistance of the hospital staff to secure samples. In the event that medical personnel are not cooperative, it is recommended that officers seek the assistance of their county prosecutor. Although [Schmerber v. California, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966)] . . . determined that consent to be tested is not required, recent developments [State v. Ravotto, 169 N.J. 227 (2001)] suggest that we attempt to obtain consent (request that the suspect sign a consent form) and, in the event that the suspect refuses, seek a warrant from the court.

Both troopers testified they were aware of the document, and stated that it did not require troopers to obtain consent or a warrant before transporting a defendant to the hospital for a blood draw. Trooper Gould testified that he had never sought a

telephonic warrant in connection with any previous DWI investigation.

While Trooper Gould was speaking to defendant, Trooper Freeland arrived at the scene. Trooper Freeland observed that "defendant had bloodshot eyes, spoke very slowly and slurred his words." When Trooper Freeland asked defendant for his identification, defendant responded that his wallet was in the center console of his car. Trooper Freeland retrieved the wallet and, in addition, found an empty prescription bottle labeled "methadone" in the console. When Trooper Freeland asked defendant about the bottle, defendant admitted he was a heroin addict and "had taken methadone earlier in the day[.]"

At that time, Troopers Gould and Freeland left defendant in the patrol car and went to assist the others in extricating Officer Wargo. On the way, Trooper Freeland saw Trooper James Hamill and informed him about the methadone bottle. After the troopers were finally able to get Officer Wargo out of the car, EMT personnel attempted to resuscitate him, and Trooper Gould called for a medical evacuation helicopter to come to the scene. In preparation for the helicopter's arrival, the troopers established a landing zone on Route 80, just eastbound of the crash site. All of the lanes were closed to traffic during this period.

After Trooper Hamill learned that a methadone bottle had been found, he went to Trooper Gould's patrol car to speak to defendant. Trooper Hamill noted that defendant's "pupils were extremely constricted at the time." Trooper Hamill directed defendant to the rear of the car in order to administer field sobriety tests. Trooper Hamill observed defendant's eyes with a flashlight and noticed no change to the pupils after the light was removed, which he stated was an indication of drug use. Defendant was also swaying from side-to-side. The trooper terminated the tests when defendant began to complain of a headache. At that time, Trooper Hamill placed defendant under arrest for DWI, handcuffed him, and read him his <u>Miranda</u>[1] rights.

At approximately 1:05 a.m., the helicopter arrived and transported Officer Wargo to Morristown Memorial Hospital. At this time, the troopers on the scene began to take statements from each civilian who had stopped at the accident scene. Trooper Gould spoke to between three and five witnesses shortly after the helicopter left. Trooper Freeland testified he remained on the scene for approximately thirty to forty minutes to assist with traffic control before leaving to resume his regular patrol duties.

---

[1] <u>Miranda v. Arizona</u>, 384 <u>U.S.</u> 436, 478-79, 86 <u>S. Ct.</u> 1602, 1630, 16 <u>L. Ed.</u> 2d 694, 726 (1966).

After Trooper Hamill arrested defendant, Trooper Miller, a more senior officer, arrived at the scene and questioned defendant further. Defendant told Trooper Miller that he took methadone "not that long ago." Defendant then invoked his right to remain silent and the questioning ceased.

Trooper Hamill radioed for a State Police drug recognition expert to come to the scene. However, another more senior trooper told Trooper Hamill "that that would not occur tonight and that we would just go right to the hospital and obtain blood." According to Trooper Hamill, it was preferable to obtain a blood sample "[a]s soon as possible, as feasible . . . depending on the circumstances of the incident" because "[t]hat way we can get a more accurate reading as to what was in his system at the time."

Trooper Gould was assigned to take defendant to Morristown Memorial Hospital for the blood draw. Before he was able to do so, a fatal accident unit investigator had to create a safe path for Trooper Gould to travel through the accident scene without damaging any evidence. Trooper Gould left for the hospital with defendant at approximately 1:27 a.m. Trooper Sousa followed in a patrol car to assist with defendant at the hospital. The other troopers remained at the accident scene to continue the investigation.

On the way to the hospital, Trooper Gould noticed defendant was "on the nod" in the back seat, falling asleep, and then waking up. Trooper Gould arrived at approximately 1:46 a.m. Troopers Gould and Sousa had to find a safe location for defendant to wait because Officer Wargo's family was also at the hospital and the troopers wanted to keep defendant separated from them.

At 2:45 a.m., a patient care technician drew defendant's blood. Trooper Sousa took the sample back to the barracks. Trooper Gould remained at the hospital with defendant until approximately 5:30 a.m., when defendant was discharged. Trooper Gould then transported defendant to the barracks for processing.

Based on the totality of these circumstances, Judge Stephen Taylor applied the Adkins II standards and rendered a comprehensive twenty-page written decision denying defendant's suppression motion. The judge found that "[g]iven the circumstances of the crash and their interaction with defendant, the troopers clearly had probable cause to believe . . . defendant was operating his vehicle under the influence of a controlled dangerous substance." Although Trooper Freeland found a methadone bottle in defendant's car, and defendant stated he had ingested methadone at some point earlier in the evening, the troopers were not certain what type of drug defendant had taken or when he had taken it. Thus, the judge found that "[t]he potential dissipation of the unknown drug

11

or drugs ingested by defendant [was] a substantial factor in determining the objective exigency of the circumstances" under Adkins II. Trooper Gould stated "that he knew evidence of drug use dissipated, but not the specific elimination rates." Thus, the judge determined that "[u]nder the circumstances, it was entirely reasonable for the troopers to believe that evidence of drug impairment might dissipate before a warrant could be obtained."

Judge Taylor credited Trooper Gould's and Trooper Freeland's testimony that even though they were aware of the "Obtaining Blood for [DWI] Prosecution" document on the State Police website, "they believed they were not required at the time to seek consent or a warrant from a neutral magistrate given the circumstances." The judge found that this credible testimony was "consistent with the legal guidance that had been handed down by the courts" prior to McNeely and Adkins II.

Citing our decision in State v. Jones (Jones II), 441 N.J. Super. 317 (App. Div. 2015), Judge Taylor determined there were special facts presented in this case that justified the troopers' decision to obtain a blood draw without a warrant. This was not a routine DWI stop. There was a two-car accident, in which defendant's vehicle was blocking a heavily-traveled interstate highway and Officer Wargo's vehicle was on fire in the woods. The

troopers had to get control of the accident scene, which was already teeming with civilians, extinguish the fire, attempt to extricate the seriously injured officer from his demolished patrol car, arrange for EMTs and other support personnel to get to the scene, interview the witnesses, and call in an emergency medical evacuation helicopter.

While all this was happening, the troopers simply did not have time before Officer Wargo was evacuated to the hospital to divert their attention to defendant as they could have if this had been a routine DWI arrest. Once the helicopter left the scene, the troopers were able to attempt field sobriety tests, interview defendant, and place him under arrest. A path through the accident scene then had to be set up to enable Trooper Gould to safely leave with defendant for the hospital. Trooper Gould was able to get defendant to the hospital in approximately twenty minutes. Although hospital staff did not perform the blood draw for another hour, the blood could have been drawn as soon as defendant arrived at the hospital.

Summarizing these unique circumstances, Judge Taylor found:

> The nature of the accident, the emergency response to remove Officer Wargo from his vehicle and transport him by air to the hospital, the need to secure and investigate the scene[,] and the time spent transporting . . . defendant to the hospital all contributed to the significant delay before a

13

blood sample could be obtained. The objective facts clearly show that obtaining a warrant would have involved additional delay that could have further threatened the destruction of the blood evidence.

Thus, the judge concluded that "the warrantless blood draw was justified, giving substantial weight to the credible belief of the troopers that the drug evidence would dissipate, and considering as well the troopers' reasonable response to the events surrounding the accident and arrest of . . . defendant." This appeal followed.

III.

On appeal, defendant raises the following contentions:

The Totality of Circumstances Favor a Finding that Exigent Circumstances Did Not Exist, and a Warrant Should Have Been Obtained.

A. The Standard of Review Favors Reversal of this Matter.

B. The New Jersey and Federal Constitutions Favor Obtaining a Search Warrant Prior to Any Search.

C. Exigent Circumstances Did Not Exist, And Thus, There Was No Justification for the Search of [defendant's] Blood.

D. The State Police Should Have Obtained a Telephonic Warrant.

E. The Trial Court's Conclusion on the Officers' Perceived Dissipation Was Unsupported by the Record Adduced at the Suppression Hearing.

F. The Trial Court Erred in Equating a Urine Specimen with a Blood Draw.

14

G. Judge Taylor's Rejection of the State Police Protocol Misconstrued the Evidence on the Record.

H. The Trial Court Erred in Finding an Exigency Existed Because Defendant Did Not Suffer any Injury.

I. The State Failed to Meet its Burden Because It Did Not Call the Officer in Charge of the Investigation to Testify at the Suppression Hearing.

Our review of a trial judge's decision on a motion to suppress is limited. State v. Robinson, 200 N.J. 1, 15 (2009). We accord deference to the trial judge's factual findings, "so long as sufficient credible evidence in the record supports those findings[,]" State v. Gonzalez, 227 N.J. 77, 101 (2016), or where those findings "are substantially influenced by [the trial judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Johnson, 42 N.J. 146, 161 (1964). See also State v. S.S., 229 N.J. 360, 379 (2017) (holding "that a standard of deference to a trial court's factfindings . . . best advances the interests of justice in a judicial system that assigns different roles to trial courts and appellate courts"). However, we owe no deference to the trial judge's legal conclusions or interpretations of the legal consequences flowing from established facts and our review

A-3218-15T2

in that regard is de novo.  State v. Watts, 223 N.J. 503, 516 (2015).

Applying these principles, we discern no basis for disturbing Judge Taylor's reasoned determination that the totality of the circumstances the troopers had to confront amply supported the warrantless blood draw at the hospital under Adkins II.  We therefore affirm substantially for the reasons expressed by Judge Taylor in his thoughtful and comprehensive written opinion.  We add the following comments.

As Judge Taylor observed, the emergency situation presented in this case was analogous to the facts in Jones II, where we found exigent circumstances supporting a warrantless blood draw in another pipeline case.  In Jones II, the defendant caused a three-car accident "at a busy intersection."  Supra, 441 N.J. Super. at 321.  Eleven police officers, four EMTs, a number of firefighters, fire trucks and other emergency service vehicles responded to the scene.  Ibid.  The defendant was injured in the accident and it took about thirty minutes to extricate her from her car.  Ibid.  The defendant was unconscious and one of the other drivers was also injured.  Ibid.  They were taken to the hospital where a blood sample was drawn from the defendant approximately seventy-five minutes after the police first arrived at the scene.  Ibid.

16                                            A-3218-15T2

Similar to the defendant in <u>Jones II</u>, here, defendant lost control of his speeding vehicle and drove it head-on into Officer's Wargo's police car. Approximately nine troopers, together with municipal police officers, EMTs, and firefighters, responded to the accident scene with emergency equipment and vehicles. The troopers had to close Route 80, re-route traffic, manage and safeguard the integrity of the accident scene, protect the civilians who were onsite, attempt to extricate the seriously injured officer from his car, arrange for a medical evacuation helicopter to come to the scene, and then create a landing area for it.

It took approximately one hour to extricate Officer Wargo and transport him to the hospital. During that period, the troopers largely had to leave defendant alone in the back of a patrol car. By 1:05 a.m. when Officer Wargo left in the helicopter, the troopers suspected defendant was under the influence of one or more drugs, and Trooper Freeland had found the methadone bottle. Defendant also stated he had taken methadone at some unspecified point earlier in the evening. Once Trooper Hamill attempted to conduct field sobriety tests and Trooper Miller questioned defendant, Trooper Gould made arrangements with a fatal accident unit investigator on the scene to clear a path through the debris to enable him to take defendant to the hospital for a blood draw.

17                                                A-3218-15T2

Although the troopers did not know what drug defendant had taken, they knew they needed to have the blood test performed as soon as possible because the presence of drugs in the blood dissipates over time. Trooper Gould got defendant to the hospital by 1:46 a.m. and the hospital performed the blood draw at 2:45 a.m.

Therefore, except for the fact that defendant was not seriously injured, the circumstances here are virtually identical, and comparably exigent, to those presented in Jones II. In both cases, there was a serious accident on a major highway, injuries requiring hospitalization of one of the drivers, and at least an hour-long police investigation involving a number of police officers and emergency personnel. Viewing the totality of the circumstances of this case objectively, we are satisfied that Judge Taylor properly concluded that the troopers were confronted with an emergency situation that justified the warrantless blood draw under Adkins II.

Judge Taylor also correctly rejected defendant's attempts to isolate several facts in this case from the totality of all of the circumstances to support his argument that the troopers should have sought defendant's consent or a warrant prior to obtaining the blood draw. For example, defendant again asserts on appeal that so many troopers responded to the scene that one of them could have left what he or she was doing and sought a telephonic

A-3218-15T2

warrant to seize defendant's blood. However, as discussed above, each of the troopers at the chaotic accident scene was performing multiple necessary tasks, including directing traffic, attempting to extricate Officer Wargo, and interviewing witnesses.

Thus, almost a full hour had already passed by the time the troopers were finally able to turn their full attention to defendant at 1:05 a.m. Within twenty minutes, Gould was on his way to the hospital with defendant, and the blood draw could have occurred at any point after they arrived at 1:46 a.m. As defendant concedes, any attempt to obtain a telephonic warrant at that point would have taken at least fifty-nine additional minutes and possibly as long as two more hours. State v. Witt, 223 N.J. 409, 436 (2015). Thus, the troopers clearly had an objective basis based on the exigencies presented for proceeding with the warrantless blood draw at the earliest possible time.

Like Judge Taylor, we also reject defendant's argument that the troopers failed to comply with a "protocol" for seeking a warrant set forth in the "Obtaining Blood for [DWI] Prosecution" document. As Judge Taylor found, the troopers credibly testified that this document did not require them to obtain a warrant prior to taking a suspect to the hospital for a blood draw, and we defer to the judge's credibility determination. State v. Locurto, 157 N.J. 463, 474 (1999).

Moreover, the document states that "consent to be tested is not required," and it merely "suggest[s]" that an "attempt to obtain consent" be made and a warrant sought if consent is not forthcoming. Under these circumstances, we discern no basis for disturbing Judge Taylor's finding that the troopers' testimony concerning the document was "consistent with the legal guidance that had been handed down by the courts" up to the time of the McNeely decision.

As for the balance of defendant's arguments not expressly discussed above, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

In sum, the troopers' actions were clearly appropriate under the totality of these circumstances. Therefore, Judge Taylor properly denied defendant's motion to suppress the blood test results.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3218-15T2