2015 COA 4

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

**v.**

**Victoria BARRY, Defendant–Appellant.**

**Court of Appeals No. 12CA1741**

Colorado Court of Appeals,
Div. II.

Prior Opinion Announced October 9, 2014

Announced January 29, 2015

1140

Cynthia H. Coffman, Attorney General, Brock J. Swanson, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Dean Neuwirth P.C., Dean Neuwirth, Denver, Colorado, for Defendant–Appellant.

Opinion by JUDGE CASEBOLT

¶ 1 Defendant, Victoria Barry, appeals the order denying her motion to suppress and the judgment of conviction and sentence entered on jury verdicts finding her guilty of vehicular homicide (driving under the influence); vehicular homicide (reckless driving); driving under the influence (DUI); driving with excessive alcohol content; and third degree assault. We affirm in part, vacate in part, and remand with directions.

### I. Procedural History and Background

¶ 2 At approximately 11:40 p.m. defendant was involved in a head-on collision in the northbound lanes of the divided highway of Interstate 25. Defendant was driving a dark blue sport utility vehicle (SUV) and one victim, L.D., was driving a light-colored sedan. The collision occurred because one of these two vehicles was traveling in the wrong direction on the roadway.

¶ 3 L.D. was killed on impact. When the SUV and the sedan collided, the vehicles spun and the SUV hit another car, a Mercury Mountaineer. This second collision injured victims J.M., the driver of the Mountaineer, and M.B., a passenger.

¶ 4 A police officer arrived at the scene of the accident within minutes of the collision. He assessed the passengers in the vehicles for injuries and spoke with defendant for approximately thirty seconds. He observed no overt signs that she was intoxicated but noted that she was alone in the car and was dazed and disoriented.

¶ 5 When a second officer arrived on scene, he spoke with defendant while she was being cared for by emergency medical personnel. When he asked defendant how the accident had happened, she responded, "What accident?" Defendant also told this officer that she had been at a local tavern and had consumed "a drink." He spoke with defendant for less than one minute before medical personnel resumed treatment and took her to the hospital. Other than her confusion and the statement about the drink, he noticed no indicia of intoxication.

¶ 6 While on the scene, the second officer received notification from his dispatcher that, minutes before the accident occurred, multiple 911 callers had reported a black SUV driving the wrong way on northbound Interstate 25 near the accident site. He relayed this information to a traffic investigation detective once the detective arrived on the scene.

¶ 7 After learning the above information, the detective noted that defendant's SUV was dark blue, but it was such a dark color that it appeared black. The detective directed a third officer to speak with defendant at the hospital. This officer noted that defendant "spoke well," but she could not remember getting on the highway. Defendant again mentioned being at a local tavern and asked the officer about the condition of the other people in her car. The officer noted no indicia of intoxication except for her inquiry about other passengers in her vehicle (there were none).

¶ 8 At approximately 1:00 a.m., the detective ordered Officer Curtis, a DUI officer, to go to the hospital to obtain a blood sample from defendant for alcohol analysis. Officer Curtis arrived at the hospital at approximately 1:30 a.m. and saw defendant being attended by medical personnel. While waiting for a chance to speak with defendant, he observed her and noted that her responses to medical personnel were slow, her speech was slurred, and her eyes were red and watery.

¶ 9 Curtis identified himself to defendant as a DUI officer and attempted to engage her in conversation, but defendant remained silent and did not respond to him. Curtis then obtained a DUI kit from a police office located within the hospital and ordered an emergency medical technician (EMT) to draw defendant's blood. Curtis observed the blood being drawn from defendant's arm. Police did not attempt to secure a warrant before obtaining the blood draw.

¶ 10 A later test of defendant's blood revealed a blood-alcohol content (BAC) of .219 grams of ethyl alcohol per 100 milliliters of blood, well over the legal limit.

¶ 11 The prosecution ultimately charged defendant with DUI vehicular homicide in the death of L.D., reckless vehicular homicide in L.D.'s death, DUI, driving with excessive alcohol content, third degree assault as to J.M., and third degree assault as to M.B.

¶ 12 Before trial, defendant moved to suppress the evidence of her BAC, arguing that (1) the blood was obtained without a warrant; (2) the police lacked probable cause to arrest her for an alcohol-related offense; and (3) there were no exigent circumstances sufficient to show that obtaining a warrant was impractical.

¶ 13 At a hearing on the motion, the officers involved in the investigation testified to the above facts and observations. The detective also testified that the vehicle traveling in the wrong direction on the highway would have traveled at least ten to twelve blocks before reaching the accident site. He stated that at the time he ordered defendant's blood draw he did not know which vehicle was driving in the wrong direction and needed to investigate further to reach a conclusion. He acknowledged that J.M. had indicated that he was driving behind defendant's vehicle, which was in the correct lane. However, based on defendant's admission to having one drink before the accident and the 911 calls identifying a black SUV traveling the wrong direction near the accident site, he was investigating defendant for DUI.

¶ 14 The trial court denied defendant's motion and the prosecution introduced defendant's BAC level at trial. The lab report showing these results was admitted without objection. Other evidence included a written certification from the EMT who drew defendant's blood that she had collected the blood by venipuncture. The EMT did not testify at trial. However, the analyst who conducted the BAC analysis testified at length as to the results, the chain of custody for defendant's blood samples, and the reliability of the machines that produced the analysis.

¶ 15 The jury heard evidence of defendant's locations that night through her cell phone records. The detective, who was qualified as an expert in accident reconstruction, also testified that the positioning of the vehicles showed that defendant's vehicle was traveling the wrong way on the highway, which was inconsistent with the theory that L.D. had driven her car in the wrong direction. Additionally, defendant stipulated that the medical examination conducted on L.D. showed there was no trace of alcohol or drugs in her system.

¶ 16 Defendant's theory of the case at trial was that she was not intoxicated and L.D. was the driver who caused the accident by driving the wrong way on the highway.

¶ 17 The jury convicted defendant on all counts except third degree assault concerning J.M. The court sentenced defendant to ten years of imprisonment on the vehicular homicide DUI count and imposed concurrent sentences on the remaining counts.

## II. Warrantless Blood Draw

¶ 18 Defendant first contends that the trial court erred in denying her motion to suppress the BAC results because her blood was obtained without a warrant; the police lacked probable cause to believe that she had committed an alcohol-related driving offense; and there were no exigent circumstances that made it impractical to obtain a warrant. We conclude that there was probable cause to arrest defendant on an alcohol-related driving offense. We also conclude that, although there may be a question as to whether exigent circumstances existed for the warrantless blood draw under *Missouri v. McNeely*, 569 U.S. ——, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013), a case decided after the notice of appeal was filed in this case, the police here acted in reasonable good faith reliance upon then-binding appellate court precedent. *See Davis v. United States*, 564 U.S. ——, ——, 131 S.Ct. 2419, 2434, 180 L.Ed.2d 285 (2011). Thus, suppression of the warrantless blood draw is not called for in these circumstances.

### A. Standard of Review

¶ 19 When reviewing a motion to suppress, we defer to a trial court's findings of fact as

long as they are supported by the record, and we review de novo the court's conclusions of law. *People v. Brunsting*, 2013 CO 55, ¶ 15, 307 P.3d 1073. We may look only to the evidence presented in the suppression hearing in reviewing the trial court's ruling on such matters. *Moody v. People*, 159 P.3d 611, 614 (Colo.2007).

¶ 20 Whether an officer's actions with respect to conducting a nonconsensual blood draw without a warrant were in good faith reliance on then-binding appellate court precedent presents a question of law. Hence we review that issue de novo. *See People v. Hagos*, 250 P.3d 596, 619 (Colo.App.2009).

### B. Applicable Law

¶ 21 The Fourth Amendment prohibits unreasonable searches and seizures. "[A] warrantless search of the person is reasonable only if it falls within a recognized exception" to the warrant requirement. *McNeely*, 569 U.S. at ——, 133 S.Ct. at 1558.

¶ 22 A blood draw is a search because it is "a compelled physical intrusion beneath [a defendant's] skin and into his veins to obtain a sample of his blood for use as evidence in a criminal investigation." *Id.* This constitutes "an invasion of bodily integrity [that] implicates an individual's 'most personal and deep-rooted expectations of privacy.'" *Id.* (quoting *Winston v. Lee*, 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985)); *see also Grassi v. People*, 2014 CO 12, ¶ 23, 320 P.3d 332 ("Drawing blood from an unconscious party is a search that is 'subject to the protections of the Fourth Amendment to the United States Constitution.' In the motor vehicle context, the police infringe upon these protections if they draw blood from a non-consenting driver absent probable cause that he committed an alcohol-related driving offense.") (quoting in part *People v. Schall*, 59 P.3d 848, 851 (Colo.2002) (citation omitted)).

¶ 23 A warrantless, nonconsensual blood draw is reasonable if four criteria are satisfied:

(1) there must be probable cause for the arrest of the defendant on an alcohol-related driving offense; (2) there must be a clear indication that the blood sample will provide evidence of the defendant's level of intoxication; (3) exigent circumstances must exist which make it impractical to obtain a search warrant; and (4) the test must be a reasonable one and must be conducted in a reasonable manner.

*Schall*, 59 P.3d at 851.

¶ 24 Relying on *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), Colorado courts have held that "[b]ecause alcohol dissipates quickly in the blood, exigent circumstances exist when time has elapsed while the driver is transported to a hospital and the investigating officer is detained at the accident scene." *Schall*, 59 P.3d at 853 (internal quotation marks omitted). Hence, before the opinion in *McNeely*, Colorado appellate precedent did not require a warrant to be obtained before drawing blood under such circumstances.

¶ 25 However, the United States Supreme Court has recently held that the natural metabolization of alcohol in the bloodstream does not present a per se exigency that justifies an exception to the Fourth Amendment's search warrant requirement for nonconsensual blood testing in all drunk-driving cases. *McNeely*, 569 U.S. at ——, 133 S.Ct. at 1561. Instead, exigency in this context must be determined case by case based on the totality of the circumstances. *Id.*; *see also People v. Schaufele*, 2014 CO 43, ¶¶ 23–24, 325 P.3d 1060. The totality of the circumstances test is a "finely tuned" fact-based approach, intended to be malleable enough to address the "variety of circumstances [that] may give rise to an exigency sufficient to justify a warrantless search...." *McNeely*, 569 U.S. at ——, 133 S.Ct. at 1559; *see also Schaufele*, ¶ 24; *accord Brunsting*, ¶¶ 15, 28.

¶ 26 Defendant challenges the warrantless blood draw on probable cause and exigent circumstances grounds, the first and third prongs of the test.

### 1. Probable Cause and Fellow Officer Rule

¶ 27 "Probable cause is a flexible standard deriving from a common sense concept of reasonableness." *People v. Grazier*,

992 P.2d 1149, 1153 (Colo.2000). The police have probable cause to support a blood draw "when the facts and circumstances known to the police are sufficient to warrant the belief by a reasonable and prudent person that the defendant committed an alcohol-related offense." *Schall,* 59 P.3d at 851. This probable cause determination must rest "on all of the facts and circumstances known to the police at the time . . . ." *Id.*

¶ 28 To establish probable cause, the police need not possess absolute certainty of the driver's misconduct but must instead develop "that degree of certainty upon which reasonable and prudent people rely in making decisions in everyday life." *Id.* "While certain facts may not establish probable cause in isolation, those same facts may support a finding of probable cause when considered in combination." *Grassi,* ¶ 23 (citing *Schall,* 59 P.3d at 852).

¶ 29 The fellow officer rule operates to impute information that the police possess as a whole to an individual officer. *Id.* at ¶ 13. " '[W]here law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all.' " *Id.* at ¶ 14 (citing *Illinois v. Andreas,* 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983)). When the police expand the scope of their investigation to include other officers not currently on scene, "the fellow officer rule operates to integrate those outside officers and make them part of the coordinated investigation." *Id.*

¶ 30 The fellow officer rule imputes shared information to an individual officer if two conditions are met: (1) the officer must act "at the direction [of] or as a result of communications with another officer, thus ensuring that he acted pursuant to a coordinated investigation"; and (2) "the police as a whole" must possess the information. *Id.* at ¶ 15 (internal quotation marks omitted). So long as the police remain engaged in a coordinated investigation, the rule encompasses information that the police as a whole possess at the time of a search or arrest. *Id.* at ¶ 18. Therefore, the rule encompasses any information that the police gather between the initial assignment and the officer's ultimate search or arrest as part of a coordinated investigation. *Id.* at ¶ 21.

### 2. Driving While Impaired or Intoxicated

¶ 31 Driving while ability impaired in the alcohol context means

driving a motor vehicle . . . when a person has consumed alcohol . . . that affects the person to the slightest degree so that the person is less able than the person ordinarily would have been . . . to exercise clear judgment, sufficient physical control, or due care in the safe operation of a vehicle.

§ 42–4–1301(1)(g), C.R.S.2014. Similarly, driving under the influence means "driving a motor vehicle . . . when a person has consumed alcohol . . . that affects the person to a degree that the person is substantially incapable . . . [of] exercis[ing] clear judgment, sufficient physical control, or due care in the safe operation of a vehicle." § 42–4–1301(1)(f).

### 3. Good Faith Exception to the Exclusionary Rule

¶ 32 The Fourth Amendment protects against unreasonable searches and seizures but is silent regarding the suppression of evidence obtained in violation of this command. *Davis,* 564 U.S. at ——, 131 S.Ct. at 2426. The exclusionary rule is a "prudential" doctrine created by the courts. *Id.* Exclusion of evidence obtained in violation of the Fourth Amendment is not a constitutional right, and the exclusionary rule is not designed to redress the injury of an unconstitutional search. *Id.* "The rule's sole purpose . . . is to deter future Fourth Amendment violations." *Id.*

¶ 33 Exclusion exacts a heavy toll on the judicial system and society because "[i]t almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Id.* at 2427. For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs. *Id.*

When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent

value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.

*Id.* at 2427–28 (internal quotation marks and citations omitted).

¶ 34 Thus, police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield "meaningfu[l]" deterrence, and culpable enough to be " 'worth the price paid by the justice system.' " *Id.* at 2428 (quoting *Herring v. United States,* 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009)). "When the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply." *Id.* at 2434.

### C. Application

#### 1. Probable Cause

¶ 35 Defendant first contends that the detective lacked probable cause to arrest her for an alcohol-related offense when he ordered her blood drawn at approximately 1:00 a.m. Applying the fellow officer rule discussed in *Grassi,* ¶¶ 18, 21, the proper analysis is whether probable cause existed at 1:41 a.m., when defendant's blood was drawn, because that is when the search occurred. But even if the inquiry is whether probable cause existed at 1:00 a.m., as defendant contends, we conclude that probable cause existed at that time sufficient to arrest defendant on an alcohol-related driving offense.

¶ 36 Following the suppression hearing, the trial court found that police knew defendant was traveling the wrong way down the highway; she had consumed a drink at a local tavern before the accident; her speech was slow and slurred, and her eyes were red and watery; and her statements at the accident scene were inconsistent with other evidence showing what had taken place, inasmuch as she was unaware that there had been an accident and had twice said that other people had been in her car even though she was alone.

¶ 37 First, the trial court correctly applied the fellow officer rule because the evidence showed that all of the officers, including Officer Curtis, acted pursuant to a coordinated investigation. Each officer carried out different parts of the investigation "at the direction [of] or as a result of communications with another officer...." *Grassi,* ¶ 15. Further, each officer testified as to his or her observations and investigation at the suppression hearing, making it clear that the police as a whole possessed the requisite information. *Id.*

¶ 38 Second, the trial court did not err in relying on Officer Curtis's observations of defendant immediately before the blood draw. *Grassi* is clear that the fellow officer rule encompasses any information that the police gather between the initial assignment—here responding to the accident—and the officer's ultimate action—the blood draw—as part of a coordinated investigation. *Id.* at ¶ 21.

¶ 39 Third, the trial court's findings about what the officers collectively knew at the time of the blood draw are supported by competent evidence in the record. The 911 calls and the position of defendant's SUV at the accident scene support a finding that the officers had collective knowledge sufficient to conclude it was likely that defendant was traveling the wrong direction. According to defendant's own statements, she had been at a local tavern and had consumed an alcoholic drink before the accident and did not realize an accident had occurred. Furthermore, she erroneously believed that she had passengers in the car. Finally, Officer Curtis testified as to his observations of defendant and the physical indicia of intoxication.

¶ 40 However, even excluding Officer Curtis's observations from the probable cause analysis, as defendant urges, we conclude probable cause still existed for the other reasons found by the trial court. There was clear evidence of improper driving because the SUV would have had to travel, at minimum, ten to twelve blocks in the wrong direction on a clearly marked highway without the driver attempting to stop or pull

over. The officers here need not have been "certain" that defendant was intoxicated; the test is whether the facts and circumstances would warrant the belief by a "reasonable and prudent person" that defendant was driving while intoxicated or impaired. *Schall,* 59 P.3d at 851.

¶ 41 The 911 calls, defendant's SUV being similar to a vehicle reported to have been traveling in the wrong direction, the position of defendant's vehicle, her statements about drinking and the circumstances of the accident, and the distance she would have traveled the wrong way on a divided highway, taken as a whole, are sufficient to warrant a reasonable person believing that defendant was driving while under the influence of alcohol such that she was less able than she ordinarily would have been or substantially incapable of exercising clear judgment or due care in the safe operation of the vehicle. § 42–4–1301(1)(f)–(g).

### 2. Exigent Circumstances

¶ 42 Defendant also attacks the trial court's denial of her motion to suppress on exigency grounds. We conclude that, even if there were insufficient exigent circumstances to support a warrantless search, exclusion of the blood alcohol test results, the remedy defendant requests, is not appropriate here.

¶ 43 When considering exigency, the trial court relied on pre-*McNeely* precedent and stated that, "because alcohol dissipates quickly in the blood, exigent circumstances exist, for instance, when time has elapsed between when a driver is transported to the hospital and when an officer arrives at the accident scene." The trial court then noted that the accident had occurred at 11:40 p.m. and the forced blood draw occurred after two hours had already elapsed; therefore, exigent circumstances existed. In making this conclusion, the trial court clearly relied on *Schall,* 59 P.3d at 853, which held that, because alcohol dissipates quickly in the blood, exigent circumstances exist when the driver is transported to the hospital and the investigating officer is detained at the accident scene.

¶ 44 In January 2013, the United States Supreme Court rejected this reasoning in *McNeely,* holding that metabolization of alcohol in the blood does not, by itself, constitute exigent circumstances. The People argue on appeal that suppression is inappropriate because the trial court did not conclude that the natural metabolization of alcohol in the bloodstream alone created exigent circumstances. We do not read the record to support that contention, as the trial court clearly relied on *Schall* in making its exigency conclusion.

¶ 45 But the People also argue, citing *Davis,* 564 U.S. at ——, 131 S.Ct. at 2429, that exclusion is inappropriate here because the officers conducted the warrantless blood draw in objectively reasonable reliance on the then-binding appellate court precedent in *Schall.* We agree with that contention.

¶ 46 The warrantless blood draw at issue occurred in May 2011 and the trial in which the results were admitted as evidence occurred in June 2012. Defendant was sentenced and filed her appeal in August 2012. *McNeely* was not decided until January of 2013, while defendant's appeal was pending.

¶ 47 Prior to *McNeely,* the Colorado Supreme Court had interpreted federal precedent to hold that exigent circumstances excusing the necessity of a warrant existed when alcohol was dissipating in the blood and the suspect had been taken to the hospital while the investigating officer stayed at the scene. *Schall,* 59 P.3d at 853; *People v. Shepherd,* 906 P.2d 607, 610 (Colo.1995); *People v. Milhollin,* 751 P.2d 43, 48–49 (Colo. 1988).

¶ 48 Here, the same situation was involved. The accident occurred at approximately 11:40 p.m. and defendant was taken to the hospital shortly thereafter. The investigating detective arrived at the scene around midnight, after defendant had already been taken to the hospital. After interviewing witnesses and otherwise investigating the scene, the detective ordered a DUI officer to conduct the blood draw at approximately 1:00 a.m., about one hour and twenty minutes after the accident. Because the DUI officer was not at the hospital, the blood draw was further delayed and did not occur until 1:40 a.m., approximately two hours after the accident.

¶ 49 We conclude that it was objectively reasonable for both the investigating detective and the DUI officer to proceed with the warrantless blood draw because binding Colorado precedent held that exigent circumstances excused the necessity for a warrant under these circumstances. Therefore, suppression of the blood alcohol results is not warranted. *See Davis,* 564 U.S. at ——, 131 S.Ct. at 2434; *see also People v. Hopper,* 284 P.3d 87, 90 (Colo.App.2011) (declining to suppress evidence obtained in a vehicle search because the search was proper under the precedent binding at the time).

¶ 50 Our conclusion is supported by *State v. Adkins,* 433 N.J.Super. 479, 81 A.3d 680, 687–88 (App.Div.2013). There, while acknowledging that New Jersey does not recognize a good faith exception for officers relying on problematic warrants, the court nevertheless applied the reasoning of *Davis* in declining to suppress the results of a warrantless blood draw because the officers had acted in reliance on then-existing state precedent creating a per se exigency for warrantless blood draws based on dissipation of alcohol in the blood.

¶ 51 We reject defendant's assertion that *Davis* does not apply here because *McNeely* simply explained and reaffirmed prior Supreme Court precedent without overruling any past precedent. *McNeely* clearly overruled previous holdings by Colorado courts that exigent circumstances justifying warrantless blood draws existed when alcohol was dissipating in the blood and the suspect had been taken to the hospital while the investigating officer was left at the scene. *See Schall,* 59 P.3d at 853; *Shepherd,* 906 P.2d at 610; *Milhollin,* 751 P.2d at 48–49.

¶ 52 We also reject defendant's contention that, because the *Schaufele* decision did not expressly discuss the good faith exception noted in *Davis* for instances in which officers had relied on then-binding appellate court precedent, we should not apply that exception here. We acknowledge that *Schaufele* did not discuss any good faith exception. However, we will not read into that opinion an intention that the exception could not apply. Instead, we note that *Schaufele* simply did not address the issue.

¶ 53 Accordingly, even though the blood draw here could be deemed problematic under *McNeely,* we nevertheless conclude that suppression is not required. Nor is a remand for further proceedings appropriate, in light of the fact that this determination presents a question of law, not one of fact that would require additional factual development. *Hagos,* 250 P.3d at 619.

### III. Statutory Authorization for Forced Blood Draw

¶ 54 Defendant next asserts that, even if the forced blood draw was not illegal under the Fourth Amendment, the results of her BAC test were inadmissible because there is no statutory authority to take a forced blood draw for cases of suspected DUI. We disagree.

### A. Standard of Review and Preservation

¶ 55 We review issues of statutory interpretation de novo. *People v. Padilla–Lopez,* 2012 CO 49, ¶ 7, 279 P.3d 651. When a defendant does not raise a statutory interpretation argument in the trial court, we determine whether any error requires reversal by applying the plain error test. *See People v. Ujaama,* 2012 COA 36, ¶ 38, 302 P.3d 296. Under plain error review, the defendant must establish that error occurred, that the error was obvious, and that the error's effect was so grave that it undermined the fundamental fairness of the trial itself so as to cast doubt upon the reliability of the conviction. *Id.* at ¶¶ 42, 43.

¶ 56 Here, defendant relies on section 18–3–106(a)(4), C.R.S.2014, the vehicular homicide statute, to support her assertion. She contends that it does not authorize the forced blood draw because the officers did not have probable cause to believe that L.D.'s death was caused by defendant's conduct in driving while under the influence. Defendant did not, however, assert this argument in the trial court. This issue is therefore unpreserved, and we will review for plain error.

### B. Applicable Law

¶ 57 Colorado's express consent statute provides:

No law enforcement officer shall physically restrain any person for the purpose of obtaining a specimen of such person's blood ... for testing except when the officer has probable cause to believe that the person has committed criminally negligent homicide pursuant to section 18–3–105, C.R.S., vehicular homicide pursuant to section 18–3106(1)(b), C.R.S., assault in the third degree pursuant to section 18–3–204, C.R.S., or vehicular assault pursuant to section 18–3205(1)(b), C.R.S., and the person is refusing to take or to complete, or to cooperate in the completing of, any test or tests, then, in such event, the law enforcement officer may require a blood test.

§ 42–4–1301.1(3), C.R.S.2014.

¶ 58 Vehicular assault is committed when a person "operates or drives a motor vehicle while under the influence of alcohol ... and this conduct is the proximate cause of a serious bodily injury to another...." § 18–3–205(1)(b), C.R.S.2014. Vehicular assault is a strict liability crime; therefore, the voluntary act of driving while intoxicated, by itself, is sufficient to demonstrate that such an act was a proximate cause of a victim's injuries resulting from a defendant's collision with the victim's vehicle. *People v. Smoots,* 2013 COA 152, ¶ 6, —— P.3d —— (citing *People v. Garner,* 781 P.2d 87, 89 (Colo. 1989)).

## C. Application

¶ 59 Defendant argues that because the detective did not have probable cause to believe that she had committed vehicular homicide under section 18–3–106(1)(b), he lacked statutory authority to withdraw her blood without her consent. But this argument ignores the entirety of the express consent statute. Defendant cites no cases, and we have found none, determining that a nonconsensual blood draw is authorized *only* in circumstances of vehicular homicide under section 18–3–106(1)(b). In fact, as noted above, the express consent statute lists several crimes for which a forced blood draw is authorized. § 42–41301.1(3).

¶ 60 Thus, as long as the detective had sufficient probable cause to arrest defendant for one of the enumerated crimes, defendant's nonconsensual blood draw was statutorily authorized. And we conclude that there was sufficient probable cause here.

¶ 61 First, Officer Curtis testified at the suppression hearing that he identified himself to defendant as a DUI officer and she refused to respond to him or engage with him. Although he did not specifically ask for defendant's consent to withdraw blood, her refusal to acknowledge or respond to Officer Curtis is sufficient to demonstrate her lack of cooperation.

¶ 62 Second, we have previously determined that the detective had probable cause to believe that defendant had driven under the influence or while her ability to drive was impaired. But this conclusion does not mean that those are the only alcohol-related offenses for which the detective had probable cause. At a minimum, the detective had probable cause to believe that defendant had committed vehicular assault against L.D. because he had probable cause to believe defendant was driving while under the influence and L.D. had died as a result of serious bodily injuries resulting from the collision with defendant's vehicle. Because vehicular assault is a strict liability crime, the proximate cause requirement is satisfied by a showing that defendant voluntarily drove while intoxicated. *People v. Grassi,* 192 P.3d 496, 500 (Colo.App.2008). There need not be proof that fault for the accident lay with defendant. *Smoots,* ¶ 6.

¶ 63 Therefore, the detective was statutorily authorized to force a blood draw because defendant did not cooperate with the DUI officer and there was probable cause to believe that, at a minimum, defendant had committed vehicular assault. We find no error here, let alone plain error.

## IV. Confrontation Clause

¶ 64 Defendant asserts that the trial court violated her right to cross-examination under the Confrontation Clause when it admitted evidence that her blood was drawn in a medically acceptable manner. Specifically, defendant contends the violations occurred when (1) the court allowed Officer Curtis to testify that the person who drew defendant's blood

was an EMT, one of the persons statutorily authorized to do so; and (2) the court admitted a certification signed by the EMT that she drew defendant's blood from a vein without requiring her testimony. We conclude that there was no error in allowing Officer Curtis to testify that the person who drew defendant's blood was an EMT, and that the error in admitting the testimonial statement regarding venipuncture does not rise to the level of plain error.

### A. Standard of Review and Preservation

¶ 65 Normally, we review a trial court's evidentiary rulings for an abuse of discretion; however, whether the admission of evidence violates the Confrontation Clause is reviewed de novo. *People v. Rogers,* 2012 COA 192, ¶ 12, 317 P.3d 1280. And where, as here, the Confrontation Clause issue is not preserved, we review for plain error. *E.g., Hagos v. People,* 2012 CO 63, ¶ 14, 288 P.3d 116 ("[W]e review all ... errors, constitutional and nonconstitutional, that were not preserved by objection for plain error."); *People v. Vigil,* 127 P.3d 916, 929–30 (Colo.2006) (reviewing potential Confrontation Clause violation for admission of testimonial hearsay statements for plain error when the defendant did not object to the admission of the evidence).

¶ 66 Defendant asserts that she preserved the issue of Officer Curtis's testimony regarding the EMT when counsel objected during Curtis's testimony. However, the objection to which defendant refers concerned Curtis's testimony that he saw the EMT use an iodine swab before drawing the blood. Defendant's counsel did not object to Curtis's testimony that the person he ordered to conduct the blood draw was an EMT and defense counsel did not cross-examine Curtis on this point.

¶ 67 Similarly, defendant's counsel did not object to Exhibit 156, the document containing the EMT's signed certification that she was an EMT and withdrew defendant's blood via venipuncture.

¶ 68 Defendant nevertheless contends that her pretrial request under section 16–3–309(5), C.R.S.2014, for live testimony from the "employee or technician of the criminalistics laboratory who accomplished" the analysis of her blood was sufficient to preserve this issue. We disagree.

¶ 69 In *People v. Martinez,* 254 P.3d 1198, 1201 (Colo.App.2011), a division of this court defined "the criminalistics laboratory" as "the forensic laboratory that performed the test, the results of which are being offered into evidence." Therefore, section 16–3–309(5) applies to employees of the forensic laboratory who performed the test, the results of which are being offered as evidence at trial.

¶ 70 Here, the EMT in question was not employed by any criminalistics laboratory and did not conduct the analysis of defendant's blood. Hence, defense counsel's pretrial motion pursuant to section 16–3–309(5) did not preserve defendant's Confrontation Clause assertion.

¶ 71 Consequently, we review defendant's Confrontation Clause assertions for plain error. As previously noted, under plain error analysis, defendant must establish that error occurred, that the error was obvious, and that the error's effect is so grave that it undermines the fundamental fairness of the trial itself and casts doubt upon the reliability of the conviction. *Ujaama,* ¶¶ 42, 43.

### B. Applicable Law

¶ 72 Hearsay is any statement other than one made by the declarant while testifying at trial that is offered to prove the truth of the matter asserted. CRE 801. Hearsay statements are presumptively unreliable because the declarant is not present to explain the statement in context and to be cross-examined. *People v. Phillips,* 2012 COA 176, ¶ 61, 315 P.3d 136.

¶ 73 To determine whether the Confrontation Clause is implicated by the admission of alleged hearsay evidence, a reviewing court must determine whether the admitted evidence was testimonial in nature. *Id.* at ¶ 78 (citing *Michigan v. Bryant,* 562 U.S. 344, 359–60, 131 S.Ct. 1143, 1156, 179 L.Ed.2d 93 (2011)).

¶ 74 Under the Sixth Amendment, testimonial hearsay statements must be excluded when the declarant is unavailable to testify at trial and the defendant had no prior opportunity to cross-examine the declarant. *Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *Vigil,* 127 P.3d at 921. However, even if a statement is testimonial, where the defendant is afforded an opportunity to cross-examine the witness· at trial, the Confrontation Clause is not implicated. *Phillips,* ¶ 90. Moreover, a witness may testify to his or her own observations without running afoul of the Confrontation Clause, because the witness has personal knowledge of such observations, CRE 602, and any such testimony is subject to cross-examination at trial.

¶ 75 Forensic lab reports are testimonial hearsay subject to Confrontation Clause requirements. *Cropper v. People,* 251 P.3d 434, 435 (Colo.2011). The Confrontation Clause is violated where a laboratory analyst who has signed a report that is admitted into evidence does not testify at trial. *Bullcoming v. New Mexico,* 564 U.S. ——, ——, 131 S.Ct. 2705, 2715, 180 L.Ed.2d 610 (2011).

¶ 76 Under Colorado statute, a person's blood for criminal investigations must be drawn by an authorized person (which includes EMTs) in accordance with the rules and regulations prescribed by the Colorado State Board of Health (Board ˙ of Health). §§ 18–3–106(4)(c), (d); 42–4–1301.1(5). The Board of Health requires that ·a person's blood be collected by venipuncture. Dep't of Pub. Health & Env't, 5 Code Colo. Regs. 1005–2:6.1.1.3.

¶ 77 However, strict compliance with the Board of Health rules and regulations is not a requirement for admissibility, but instead is to be considered in the weight to be given to the test results, unless the· defendant can show that noncompliance so impaired the validity and reliability of the testing that it renders the evidence inadmissible. § 18–3–106(4)(c); *Thomas v. People,* 895 P.2d 1040, 1041 (Colo.1995).

### C. Application

#### 1. Curtis's Testimony

¶ 78 Officer Curtis testified that the person he asked to conduct the blood draw was an EMT. This testimony does not run afoul of the Confrontation Clause because he was testifying to his personal knowledge, *see* CRE 602, and defendant had the opportunity to confront and cross-examine him at trial concerning this topic, even though she chose not to do so. *Phillips,* ¶ 90.

#### 2. Venipuncture Certification

¶ 79 The People concede, and we agree, that the certification (a portion of Exhibit 156) stating that defendant's blood was drawn by venipuncture and signed by the EMT who withdrew defendant's blood, is a hearsay testimonial statement. Further, the EMT did not testify at trial. Under *Crawford* and *Bullcoming,* admission of this statement was therefore erroneous. And we will assume, without deciding, that the error was obvious. *See People v. Pollard,* 2013 COA 31, ¶ 40, 307 P.3d 1124 (an error is obvious if it is contrary to established case law).

¶ 80 However, defendant must also establish that the error in admitting this testimonial statement was so egregious as to undermine the fundamental fairness of the trial and cast doubt upon the reliability of the conviction. *Ujaama,* ¶ 43.

¶ 81 Defendant asserts that because no in-court witness testified that the EMT withdrew the blood from her vein, the prosecution could not establish that the blood draw followed the Board of Health requirements and, therefore, the BAC results were inadmissible. According to defendant, it follows that the error undermined the fairness of the trial and cast doubt on the reliability of her conviction because the prosecution relied heavily on defendant's BAC level during trial, and because of the obvious effect it would have had on the jury's deliberations. We disagree.

¶ 82 In considering this prong of plain error analysis, we must determine whether obtaining the blood via venipuncture or some other method affects the accuracy or validity of subsequent testing or precludes admission of test results. *See Thomas,* 895

P.2d at 1045–46. Colorado courts have not addressed the specific issue of whether compliance with a Board of Health requirement that blood be drawn by venipuncture is a regulation that goes to the validity and reliability of the testing such that noncompliance renders the evidence inadmissible. However, the Supreme Court of New Mexico has considered this issue, and we find its reasoning persuasive. *See State v. Dedman*, 136 N.M. 561, 102 P.3d 628, 633–34 (2004), *overruled on other grounds by State v. Bullcoming*, 147 N.M. 487, 226 P.3d 1 (2010).

¶ 83 In *Dedman*, the court noted that blood is collected by three principal methods: venipuncture, skin puncture, and arterial puncture. *Id.* at 633. Because arteries are further below the surface of the skin than veins, venipuncture is considered the safest and most convenient site from which to draw blood. *Id.* In analyzing medical-legal treatises, the court concluded that "the choice of one blood collection rather than another depends on the identity of the [person from whom blood is drawn, such as an infant or child] and the purpose of the extraction, rather than on specific reliability concerns." *Id.* at 634. Furthermore, the reason for collection through venipuncture as opposed to arterial puncture is not a higher probability of accuracy, but because extraction is easier, less hazardous, and less painful when conducted through the vein. *Id.*

¶ 84 Accordingly, we conclude that whether defendant's blood draw was taken by arterial means or by venipuncture does not affect the reliability of the blood alcohol testing or the admissibility of test results. Hence, admission of the certification by the EMT that she drew the blood by venipuncture did not so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of defendant's conviction.

### V. Merger—Reckless Driving Vehicular Homicide

■ ¶ 85 Defendant contends that we must vacate her conviction for reckless driving vehicular homicide. She contends that she cannot be convicted of both DUI vehicular homicide and reckless driving vehicular homicide (for the same victim) because they are not separate offenses. Instead, she contends, they are alternative ways of committing the single crime of vehicular homicide. We agree.

¶ 86 Section 18–3–106 provides, as relevant here:

(1)(a) If a person operates or drives a motor vehicle in a reckless manner, and such conduct is the proximate cause of the death of another, such person commits vehicular homicide.

(b)(I) If a person operates or drives a motor vehicle while under the influence of alcohol ... and such conduct is the proximate cause of the death of another, such person commits vehicular homicide. This is a strict liability crime.

### A. Preservation and Standard of Review

■ ¶ 87 Initially, we reject the People's assertion that defendant waived this claim because she did not assert it within twenty-one days following her arraignment as required by Crim. P. 12(b)(2) and (3).

¶ 88 Crim. P. 12(b)(2) provides that "[d]efenses and objections based on defects in the ... information or complaint ... may be raised only by motion," which "shall include all such defenses and objections then available to the defendant." The motion "shall be made within [twenty-one] days following arraignment." Crim. P. 12(b)(3). "Failure to present any such defense or objection constitutes a waiver of it...." Crim. P. 12(b)(2).

■ ¶ 89 However, the prosecution may, as here, charge in separate counts of the complaint alternative ways of committing a single offense. *See Woellhaf v. People*, 105 P.3d 209, 214–15 (Colo.2005). The double jeopardy violation, if any, occurs when a trial court imposes multiple convictions for the same offense because the defendant committed the crime using more than one of the prohibited alternative means. *Id.*; § 18–1–408, C.R.S.2014; *see also People v. Greer*, 262 P.3d 920, 929 (Colo.App.2011) ("[T]he double jeopardy claim ripens only upon conviction of multiple offenses....").

¶ 90 Accordingly, it was not error for the prosecution to charge defendant in separate

counts under both subsections of the vehicular homicide statute, and, thus, there was no defect in the information that defendant should have raised in a Crim. P. 12 motion. Furthermore, defendant could not have asserted a double jeopardy claim prior to her conviction. Hence, defendant has not waived her claim.

¶ 91 The People acknowledge that defendant raised this claim at sentencing. Hence, she preserved the issue for appeal.

¶ 92 We review de novo whether merger applies to criminal offenses. *People v. Zweygardt*, 2012 COA 119, ¶ 40, 298 P.3d 1018.

### B. Applicable Law

¶ 93 The Double Jeopardy Clauses of both the United States and Colorado Constitutions prohibit the state from punishing a person twice for the same offense. *Meads v. People*, 78 P.3d 290, 293 (Colo. 2003). Notwithstanding this protection, "the Double Jeopardy Clause does not prevent the General Assembly from specifying multiple punishments based upon the same criminal conduct." *Woellhaf*, 105 P.3d at 214.

¶ 94 "Multiplicity is the charging of multiple counts and the imposition of multiple punishments for the same criminal conduct." *Id.* Accordingly, unless expressly authorized by the legislature, multiplicitous convictions violate the constitutional prohibition against double jeopardy. *People v. Abiodun*, 111 P.3d 462, 465 (Colo.2005).

¶ 95 The issue of multiplicity may arise where a defendant is charged with and convicted of multiple counts under a single criminal statute, and the statute does not create more than one offense but, rather, provides for alternative ways of committing the same offense. *See Woellhaf*, 105 P.3d at 215. Thus, the first relevant inquiry is whether the legislature intended to create more than one offense. *Abiodun*, 111 P.3d at 465.

¶ 96 "Where the general assembly proscribes conduct in different provisions of the penal code and identifies each provision with a different title, its intent to establish more than one offense is generally clear."

*Id.* In contrast, when the legislature joins a number of acts disjunctively in a single provision of the criminal code, courts have found that "the legislature intended to describe alternate ways of committing a single crime rather than to create separate offenses." *Id.* at 467.

¶ 97 If the criminal statute merely describes multiple ways of committing the same offense, then a defendant cannot be convicted of more than one violation of the statute unless the defendant's conduct constitutes factually distinct offenses. *See Woellhaf*, 105 P.3d at 215, 218–19; *Greer*, 262 P.3d at 924. In other words, if the convictions are not factually distinct, they merge with one another. *Woellhaf*, 105 P.3d at 219–20.

¶ 98 In *People v. Viduya*, 703 P.2d 1281, 1292 (Colo.1985), the supreme court held that the vehicular homicide statute created one crime with alternative methods of commission. In that case, the supreme court stated that "[t]he statute describes two ways in which this offense can be committed—causing the death of another while operating a motor vehicle in a reckless manner, subsection 1(a), or while under the influence of any drug or intoxicant, subsection 1(b)." *Id.* Although subsection 1(a) required proof of reckless conduct, subsection 1(b), causing death of another while under the influence, was a strict liability crime. *Id.* at 1292 n. 10. The court emphasized that "[s]imply because the alternative ways for committing a single offense require proof of different acts and even different culpable mental states does not mean that a single offense has not been defined by the statute...." *Id.* at 1292. It also stated that "[t]he fact that the alternative ways for committing vehicular homicide are not joined in the statute by the disjunctive 'or' is of no importance," noting that "[t]he statute is divided into two subsections 'which are disjunctive in the very nature of the construction of the section.'" *Id.* (quoting in part *Cortez v. People*, 155 Colo. 317, 320, 394 P.2d 346, 348 (1964)). It concluded that "[o]nly one offense, with one punishment, is described, although the offense can be committed in either one of the two ways detailed." *Id.*

¶ 99 In *People v. Lucero,* the defendant was convicted of numerous counts of vehicular homicide and vehicular assault stemming from a single traffic accident. 985 P.2d 87, 89 (Colo.App.1999). The trial court entered separate convictions for DUI vehicular homicide, reckless vehicular homicide, DUI vehicular assault, and reckless vehicular assault. *Id.* On appeal, the defendant asserted that driving recklessly and driving under the influence were alternative means of proving the singular offenses of vehicular homicide and vehicular assault, not separate and independent offenses. *Id.* at 93. Relying on *Viduya,* the court agreed and vacated the defendant's convictions for reckless vehicular homicide and reckless vehicular assault. *Id.*

¶ 100 Furthermore, in *Frazier v. People,* the supreme court cited *Lucero* for the proposition that reckless vehicular homicide and DUI vehicular homicide are not separate offenses but rather alternatives by which criminal liability for vehicular homicide may be charged and prosecuted. 90 P.3d 807, 809 (Colo.2004). The court stated that the trial court could only impose a sentence for one of the alternatives and noted that the trial court had sentenced the defendant under DUI vehicular homicide because it mandates a harsher sentence. *Id.*

¶ 101 We are bound by the decisions of the Colorado Supreme Court. *People v. Allen,* 111 P.3d 518, 520 (Colo.App.2004). Thus, we hold that the vehicular homicide statute creates a single offense of vehicular homicide, and that subsections (1)(a) and (1)(b)(I) merely provide for alternative ways of committing the same offense.

## C. Application

¶ 102 Because the vehicular homicide statute creates only one offense, and it is undisputed that defendant's vehicular homicide convictions stem from the same conduct and thus do not constitute factually distinct offenses, the trial court erred in imposing two convictions. *See Abiodun,* 111 P.3d at 471 (vacating one of the defendant's convictions because the statute defined a single offense and there was insufficient evidence at trial to support convictions for more than one commission of the offense). We therefore vacate

defendant's conviction for reckless vehicular homicide, a class 4 felony, and retain defendant's conviction for DUI vehicular homicide, a class 3 felony. *See Lucero,* 985 P.2d at 93; *see also People v. Vigil,* 251 P.3d 442, 450 (Colo.App.2010) (concluding that, when a reviewing court must vacate a duplicative conviction, it must employ the approach that will maximize the effect of a jury's verdict (citing *People v. Rodriguez,* 914 P.2d 230, 285 (Colo. 1996))).

¶ 103 Because the reckless vehicular homicide sentence was to run concurrently with that of the DUI vehicular homicide, this will not alter defendant's Department of Corrections sentence, but will require a correction of the mittimus.

## VI. Merger—Driving Under the Influence

¶ 104 Defendant contends that her DUI conviction must merge into her DUI vehicular homicide conviction because DUI constitutes a lesser included offense of DUI vehicular homicide and, thus, imposing both convictions violates double jeopardy principles. We disagree.

### A. Standard of Review

¶ 105 Defendant did not raise this issue in the trial court. Divisions of this court have split on whether to review unpreserved double jeopardy claims. Some divisions have reviewed such claims for plain error, while others have declined to review them altogether. *E.g., People v. Tillery,* 231 P.3d 36, 47–48 (Colo.App.2009) (discussing the split), *aff'd sub nom. People v. Simon,* 266 P.3d 1099, 1104–06 (Colo.2011). We are persuaded that the better view is to review unpreserved double jeopardy claims for plain error under Crim. P. 52(b). *See Tillery,* 231 P.3d at 47–48; *see also People v. Greer,* 262 P.3d 920, 931–38 (Colo.App.2011) (J. Jones, J., specially concurring) (unpreserved constitutional claims are reviewable for plain error, provided they do not require further factual development, were not waived, and are adequately presented on appeal).

¶ 106 Defendant's assertion raises only a question of law, which is adequately presented on appeal, and does not require develop-

ment of a factual record. We therefore review her claim to determine whether error occurred and, if so, whether it was obvious and there is "a reasonable possibility that the error contributed to the sentence." *Tillery*, 231 P.3d at 48 (noting that, in the double jeopardy context, "the answer would invariably be 'yes' "). If we conclude that a double jeopardy violation occurred, it will likely constitute plain error. *See id.*; *see also People v. Morales*, 2014 COA 129 ¶ 46, —— P.3d ——; *People v. Friend*, 2014 COA 123 ¶¶ 48–49, —— P.3d ——.

¶ 107 Whether an offense is a lesser included offense of another requires statutory interpretation and therefore poses a legal question. *Zweygardt*, ¶ 10.

### B. Applicable Law

¶ 108 As stated above, principles of double jeopardy generally prohibit imposing multiple punishments for the same offense. *Abiodun*, 111 P.3d at 464–65. "However, an accused may be convicted of multiple offenses arising out of the same transaction if the General Assembly makes clear its intent to punish the same conduct with more than one conviction and sentence." *People v. Zubiate*, 2013 COA 69, ¶ 36, —— P.3d —— (citing *Abiodun*, 111 P.3d at 465); (*cert. granted*, June 16, 2014).

¶ 109 "Where the general assembly proscribes conduct in different provisions of the penal code and identifies each provision with a different title, its intent to establish more than one offense is generally clear." *Abiodun*, 111 P.3d at 465. If the legislative intent to create separate offenses is clear, that is the end of the inquiry. *Meads*, 78 P.3d at 293. In such instances, separate convictions and sentences are permitted, unless one crime is a lesser included offense of the other. § 18–1–408(1)(a); *Abiodun*, 111 P.3d at 465.

¶ 110 We apply the "strict elements test" to determine whether one offense is included in the other. *Meads*, 78 P.3d at 293–94. Under that test, an offense is included in another offense if establishing the statutory elements of the greater offense necessarily establishes all the elements of the lesser offense. *See id.*; § 18–1–408(5)(a). In making this determination, we compare the statutory elements of the offenses, not the evidence presented at trial. *Armintrout v. People*, 864 P.2d 576, 579 (Colo.1993).

### C. Application

¶ 111 It is clear that the General Assembly intended to punish the conduct at issue as more than one offense. Sections 18–3–106 and 42–4–1301 establish the separate offenses of vehicular homicide and DUI, respectively. *See Abiodun*, 111 P.3d at 465. Therefore, because the legislature intended to create separate offenses, defendant may be convicted of both unless DUI is a lesser included offense of DUI vehicular assault. *See id.* We now turn to that question.

¶ 112 As noted previously, the vehicular homicide statute provides: "If a person operates or drives a motor vehicle while under the influence of alcohol ... and such conduct is the proximate cause of the death of another, such person commits vehicular homicide. This is a strict liability crime." § 18–3–106(1)(b)(I).

¶ 113 The DUI statute, section 42–4–1301(1)(a), states: "It is a misdemeanor for any person who is under the influence of alcohol

¶ 114 ... to drive a motor vehicle or vehicle." DUI is also a strict liability crime. § 42–4–1301(3).

¶ 115 Vehicular homicide requires proof that a defendant operated or drove a "motor vehicle." DUI also requires proof that a defendant drove a "motor vehicle" or "vehicle." The criminal code provides the definition for motor vehicle applicable to vehicular homicide, whereas the traffic code provides the definitions of motor vehicle and vehicle applicable to DUI.

¶ 116 The criminal code defines "motor vehicle" as "any self-propelled device by which persons or property may be moved, carried, or transported from one place to another by land, water, or air, except devices operated on rails, tracks, or cables fixed to the ground or supported by pylons, towers, or other structures." § 181–901(3)(k), C.R.S. 2014.

¶ 117 The traffic code defines "motor vehicle" as

any self-propelled vehicle that is *designed primarily for travel on the public highways* and that is generally and commonly used to transport persons and property over the public highways or a low-speed electric vehicle; except that the term does not include low-power scooters, wheelchairs, or vehicles moved solely by human power.

§ 42–1–102(58), C.R.S.2014 (emphasis added).

¶ 118 The traffic code defines "vehicle" as a device that is capable of moving itself, or of being moved, from place to place upon wheels or endless tracks. "Vehicle" includes, without limitation, a bicycle, electrical assisted bicycle, ..., but does not include a wheelchair, off-highway vehicle, snowmobile, farm tractor, or implement of husbandry designed primarily or exclusively for use and used in agricultural operations or any device moved exclusively over stationary rails or tracks or designed to move primarily through the air.

§ 42–1–102(112).

¶ 119 The criminal code's definition of "motor vehicle" is broader than the traffic code's definition of "motor vehicle" and "vehicle." *See People v. Medrano–Bustamante,* 2013 COA 139, ¶ 14, — P.3d — (*cert. granted* Sept. 8, 2014); *Zweygardt,* ¶ 24. DUI vehicular homicide can be committed by, for example, driving or operating a car, truck, snowmobile, all-terrain vehicle, farm tractor, boat, or airplane. *See* § 18–1–901(3)(k); *Medrano–Bustamante,* ¶ 14; *Zweygardt,* ¶ 24. DUI, however, can be committed only by driving a vehicle "designed primarily for travel on the public highways and that is generally and commonly used to transport persons and property over the public highways" or by operating a bicycle. § 421–102(58), (112).

¶ 120 Accordingly, many of the vehicles included under the criminal code's definition of motor vehicle, such as airplanes or boats, are not included under the traffic code's definition of motor vehicle because those vehicles are not designed for travel on and are not commonly used for transport over public highways. Moreover, the traffic code's definition of "vehicle" specifically excludes certain devices that clearly are included under the criminal code's definition of motor vehicle, such as snowmobiles, farm tractors, and airplanes.

¶ 121 Thus, an inebriated individual who causes the death of another while operating a speedboat, snowmobile, or jet airplane may be convicted of DUI vehicular homicide, but not convicted of DUI. *Cf. Zweygardt,* ¶ 25 ("[O]ne who inflicts serious bodily injury on another while drag-racing a speedboat may be guilty of vehicular assault (reckless), but not careless driving."). The fact that defendant's car here satisfies both the criminal code's and traffic code's definitions of motor vehicle is irrelevant because in conducting our merger inquiry we do not consider the evidence presented at trial, but instead look to the statutory elements. *See Armintrout,* 864 P.2d at 579.

¶ 122 Because one can commit DUI vehicular homicide without necessarily committing DUI, we conclude that DUI is not a lesser included offense of DUI vehicular homicide. *Medrano–Bustamante,* ¶ 15; *compare Zweygardt,* ¶¶ 24, 25 (holding that careless driving is not a lesser included offense of reckless vehicular assault because the traffic code's and the criminal code's definitions of motor vehicle are different), *with People v. Cruthers,* 124 P.3d 887, 890–91 (Colo.App.2005) (concluding that DUI is a lesser included offense of DUI vehicular assault but not addressing the difference between the traffic code's and the criminal code's definitions of motor vehicle), *and Grassi,* 192 P.3d at 500 (same).

¶ 123 We are aware that the division in *Cruthers* held that DUI constitutes a lesser included offense of DUI vehicular assault. 124 P.3d at 891. The division concluded that, under the strict elements test, the elements of DUI must necessarily be proved to sustain a conviction for DUI vehicular assault. *Id.* at 890. The *Cruthers* court stated that "[b]oth statutes require proof that (1) a person drove a vehicle (2) under the influence of alcohol, drugs, or a combination of alcohol and drugs." *Id.* We are also aware that a

division of this court reached a similar conclusion in *Grassi*, 192 P.3d at 500.

¶ 124 In reaching their conclusions, however, the *Cruthers* and *Grassi* divisions did not address the difference between the criminal code's definition of motor vehicle and the traffic code's definitions of motor vehicle and vehicle. Because DUI vehicular homicide and DUI have different applicable definitions of "motor vehicle" and "vehicle," we do not find *Cruthers* or *Grassi* persuasive here.

¶ 125 Therefore, the trial court did not err in entering separate convictions for DUI vehicular homicide and DUI.

### VII. Conclusion

¶ 126 We vacate defendant's conviction for reckless driving vehicular homicide and remand to the trial court for correction of the mittimus. In all other respects, we affirm the judgment of conviction.

Román and Gabriel, JJ., concur